1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| MARY (HENSELY) SANCHEZ, an individual, | CASE NO. 21-5236 RJB |
| Plaintiff, | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| ABERDEEN SCHOOL DISTRICT NO. 5, a public corporation; Defendants Jane and John Does 1-7 , | |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24

This matter comes before the Court on Defendant's Motion for Summary Judgment. Dkt. 10.  The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

This cases arises from the alleged sexual misconduct of a high school band teacher, Michael Alstad, with the Plaintiff, who was his student at the time – in the late 1980s.  Dkt. 1. The Plaintiff, now a New Mexico resident, makes Washington state law claims for negligence, "agency," violation of the Washington Law Against Discrimination, RCW 49.60, *et. seq*., ("WLAD"), negligent and intentional infliction of emotional distress, and "failure to report."

Dkt. 1.

The sole named defendant, Aberdeen School District No. 5 ("District") moves for partial summary judgment, arguing that:  (1) the Plaintiff's claims for "anxiety, insomnia and anger" are barred by Washington's three-year statute of limitations; (2) the Plaintiff's claim against the District for violation of WLAD should be dismissed as untimely; and (3) the Plaintiff's claim for "failure to report" be dismissed for lack of proximate causation.  Dkts. 10 and 19.  For the reasons provided below, the District's motion (Dkt. 10) should be granted, in part, and denied, in part.

## I.   RELEVANT FACTS AND PROCEDURAL HISTORY

**A. FACTS**

Michael Alstad was a band teacher at J.M. Weatherwax High School, commonly known as Aberdeen High School, from 1986 to 1991.  Dkt. 14-1, at 2.  In 1987, Plaintiff was a 15-year-old freshman and band student.  Dkt. 1.  In response to the District's interrogatories, the Plaintiff described the incidents between she and Alstad as follows:

> 1st incident: To the best of my recollection, in early 1987, I was in freshman band class with Mr. Alstad. He started to pay extra attention to me. We played for chairs which were for ranking positions within our prospective instruments. I always naturally strive for first chair. When I became first chair, he winked, smiled, and told me that I was excellent. At first, I believed he was truly praising me for being a great player.
>
> 2nd incident: Approximately a week after the first incident, I was walking to the breezeway between the band room and the gym near the woodshop. There was a covered parking lot for teachers. I was early for class as I had band after lunch. I walked up towards the band room and Mr. Alstad was in his silver Honda CRX. He got out of his car to proceed to unlock the band room. He then approached me wearing a black trench-type coat. He proceeded to hand me his phone number and address on a small piece of paper.  He then told me as he had his hand on my back that he has some of his students come to his house for private lessons or help.  I was shocked and flustered at the way he approached me.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 2

3rd incident: Often I would go to class early since it was close to Privatzy's school store and I would often eat lunch there. Approximately the following week, I went into the instrument room to grab my clarinet and my music. The room was located next to his office. I caught him standing in the doorway staring at me. I felt very uncomfortable as he was doing this. But I also felt flattered because I believed he liked me, and I enjoyed the attention at the time due to my age and not really knowing better. He came and put his hand on my back once again and asked if I had given his proposal any thought? I didn't know what to say and felt awkward. He then kissed my cheek and said, "Really think about it." I said I would as I stammered to get the words out. He made me feel as if I was the only one.

4th incident: I decided a few days later that I would call him. He answered and I asked if I could come over. He said, "Sure," and I let him know that I would be there soon. I asked my friend Cheryl Espedal to take me in her car. She agreed and told me as she dropped me off that she would be back in half-an-hour or so, and that she would honk when she arrived. As I approached his house, the porch light was on. I knocked and Mr. Alstad answered the door with a great big smile on his face. He was wearing a white, long sleeve t-shirt with dark slacks and slippers. He motioned for me to go to the couch. I asked him what he thought I needed work on to make me a better player. He didn't answer me which made the situation uncomfortable. Then I decided to make small talk about his life and asked if he was married. He told me he was divorced and he didn't have any kids. I clearly remember a Winton Marsalis framed poster leaning up against the wall. It wasn't very long that he told me, "enough talk," and he proceeded to take the barrettes out of my hair, took my face in his hands, and proceeded to kiss me forcibly. I really didn't know what to think or feel at that point. I was shocked. I felt like he really liked me and I was the only one. Approximately 30 minutes later, Cheryl honked the horn. I told him I had to go. He said, "No, you don't have to." I said, "Yes, I do." Cheryl honked again and I told him I really needed to go. I could hardly walk down the stairs as I was shaking. I got in Cheryl's car and said, "Go, just go!" This I know was on a Friday.

5th incident: When I went back to class, I went to his office before class and told him I wanted to talk about what happened. He told me to not discuss it at that time, but that I could come back to his house. He proceeded to kiss me on the cheek. I tried to ignore what happened and tried to put it at the back of my mind, but I couldn't. I felt ashamed and I felt as if it was my fault that this was happening.

6th incident: That same day, when I went to talk to him. I went back to his house. I told him that what we did was probably wrong. He acknowledged it probably wasn't the best thing to do, but he also told me, "We don't have to tell anyone." I told him I wouldn't as I was scared of what he might do if anyone found out. That night he kissed me again and I told him that I don't think this should be

happening, and so I left. He said if someone at the school ever found out that he would deny everything. He seemed mad about me leaving.

7th incident: I was completely quiet at home and wouldn't talk to my parents about what happened. My dad knew something was wrong. It took me two days to finally tell my dad that I had probably did something bad. I told him everything. I begged my father not to say anything because I did not want to get him in trouble. My dad said that I was not in the wrong and that he was going to contact the school and tell them to do something about it. He said, "If they don't do something about it then I'm going to clean his clock." The next day my father went to the school. He told Lynn Baker, Charles Randolph, and Frank Morrisey. I was coming from class in the Phillips building and saw my father's Toyota station wagon out front. I waited for him to come outside and asked him, "You told them, didn't you?" He said, "Your darn right I did, and I only did it for you." I ran off and skipped my next class and went to Sam Benn park. That night I told him I wanted to go live with my brother because I felt like I needed to defend Mr. Alstad and I was mad at my father for bringing this all out in the open. My brother came and got me at my house and then I went to live with him for a week so that I could get a different perspective on things.

8th incident: About three days later, I was called down to the principal's office. Mr. Randolph, Mr. Morrisey and Mr. Baker sat me down in front of them. Mr. Randolph proceeded to tell me they had went through my locker and found my Pee Chee with "I love Mike" on it along with a letter I had written. I tried to deny it by saying it was someone else. He said that if I "didn't cool it" that I "could get him fired." I agreed I would.

9th incident: I went back to band class and that was when Mr. Alstad treated me like garbage. Often ignoring me and glaring at me as if I was the enemy. I figured I could be the adult in the situation and I wanted to continue with band as I loved it and had taken it ever since I was in late elementary school. That was not the case. Instead the school blamed me. Approximately a week later, I was called down to the counseling center and Mr. Bogdonovich's office. Mr. Bogdonovich told me I could no longer be in band. I was devastated and asked, "Why?" He told me, "You know why." I didn't know what to say. I didn't ask questions anymore and my band days were over for the time being.

10th incident: In 1988, I wanted to take band again as I really desired to be in marching band as my brother had been. I talked my friend Mollie Catterson to join with me. She reluctantly agreed and went with me a handful of times. She told me that she was quitting because she was really uncomfortable around him. I was upset but continued on. He wasn't really happy that I was back in band and you could tell by his actions. Sometimes though he would smile at me like he had before. I went to marching practices and everything. Then it came time to get our uniforms. I went to the office to get my uniform and he proceeded to tell me they ran out of uniforms. I told him that's just an excuse because he couldn't be an

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 4

adult and just forget about what happened between us. I then proceeded to call him a a\*\*hole and walked out and never went back to band. That was almost to end of the 1988 class year.

11th incident: I proceeded to go back for very little of my junior year sharing a locker with freshman Tina Logan. I could tell that some of the kids knew what had happened. This made me feel uncomfortable. By then I had made up my mind that I would switch schools to Montesano High School. I asked for a transfer which the administrator signed. I was able to enjoy band for a short time at Monte but the credit system was very different from Aberdeen so I dropped out and got my GED.

12th Incident: Approximately early 1989, I called Mr. Alstad because I wanted closure that I never felt I received. I was attending Monte at the time and went to my friend Mollie Catterson's house. I had called two times prior to this time and Mr. Alstad would wait outside but I didn't go out the prior two times. The third time I called he showed up and I did go. Mollie told me not to but I did I told her I needed closure. I got into his red Mazda Miata convertible. I told him, nice car reminds me of a Jag, and he smiled and said, "yeah it does doesn't it." We talked on the way down and I told him I was able to be in band now. He said, "That's good." I also tried to persuade him to admit that what he did was wrong. He didn't. We pulled over at a gravel turnout near Ocean Shores. He then took his belt off and proceeded to try to overpower me kissing me and moving my hand to his crotch area. I pushed him away and made him get off of me. And I told him to take me back. He obliged and we didn't talk the whole way back to my friend Mollie's. That was the final time I ever saw him.

Dkt. 11-1, at 3-8.  The Plaintiff asserts that she was harmed by these events.  Dkt. 11-1, at 9.  On December 15, 2020, the Plaintiff filed a tort claim against the District.  Dkt. 11-2.  This case followed.  Dkt. 1.

**B.  PROCEDURAL HISTORY AND PENDING MOTION**

This case is in its early phases.  Discovery is to be completed by August 1, 2022, the dispositive motions deadline is August 30, 2022, and the trial is set to begin November 28, 2022. Dkt. 9.

In the pending motion, the District argues that certain of the Plaintiff's claims are barred by the statute of limitations and that her claim for failure to report should be dismissed for lack of causation.  Dkt. 10.  Plaintiff opposes the motion (Dkt. 13) and the District replied (Dkt. 19). The

District conceded in its reply that the Plaintiff has pointed to sufficient issues of fact as to its first argument as originally presented (that the entire case should be dismissed based on the statute of limitations) and so modifies its request to move only for dismissal of the Plaintiff's claims for "anxiety, insomnia and anger," Plaintiff's WLAD claim, and the failure to report claim.  Dkt. 19.

## II.   DISCUSSION

### A.  STATE SUBSTANTIVE AND FEDERAL PROCEDURAL LAW APPLIES

The Court is asserted to have jurisdiction over the case due to the diversity of the parties' citizenship under 28 U.S.C. § 1332.  Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity jurisdiction, as here, apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc*., 518 U.S. 415, 427 (1996). In applying Washington law, the Court must apply the law as it believes the Washington Supreme Court would apply it.  *Gravquick A/S v. Trimble Navigation Intern. Ltd*., 323 F.3d 1219, 1222 (9th Cir. 2003).

### B.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

1    metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is

2    sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

3    the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986);

4    *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.

5    1987).

6          The determination of the existence of a material fact is often a close question.  The court

7    must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

8    e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.*

9    *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

10   of the nonmoving party only when the facts specifically attested by that party contradict facts

11   specifically attested by the moving party.  The nonmoving party may not merely state that it will

12   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

13   to support the claim.  *T.W. Elec. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

14   Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

15   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

16   **C. WASHINGTON'S STATUE OF LIMITATIONS**

17        Washington has a statute that is specifically designed for causes of action based on childhood

18   sexual abuse, which provides:

19        All claims or causes of action based on intentional conduct brought by any person
          for recovery of damages for injury suffered as a result of childhood sexual abuse
20        shall be commenced within the later of the following periods:

21             (a) Within three years of the act alleged to have caused the injury or
               condition;
22             (b) Within three years of the time the victim discovered or reasonably
               should have discovered that the injury or condition was caused by said act;
23             or

24

(c) Within three years of the time the victim discovered that the act caused the injury for which the claim is brought . . .

RCW 4.16.340 (1).

**D.  CLAIMS BASED ON ANGER, ANXIETY AND INSOMNIA**

The Defendant argues that the Plaintiff's claims based on her "anger, anxiety and insomnia" from the alleged abuse should be barred by the statute of limitations, asserting that no exception in RCW 4.16.340(1) applies.  Dkts. 10 and 19.

It is undisputed that the alleged sexual abuse took place more than three years ago, and so to bring this action, either RCW 4.16.340(1)(b) or (1)(c) must apply.  There is no allegation that the Plaintiff discovered or should have discovered her injuries in the last three years, so RCW 4.16.340(1)(b) does not apply.  Rather, the Plaintiff asserts that she is entitled to bring her claims under RCW 4.16.340(1)(c).  Dkt. 13.

In support of its argument (that the Plaintiff's claims for "anger, anxiety and insomnia" should be dismissed) the District argues that the Plaintiff knew these injuries were caused by the abuse.  To support this assertion, it points to a response to a question regarding the Plaintiff's marriages and the "impact of [her] relationship with Michael Alstad on that marriage," in which the Plaintiff responded that:

> I never told Jose Torres about my relationship. I hid it and kept it to myself I only just recently told my husband Max Sanchez about it. I have a lot of anger, anxiety, and insomnia due to it and he just recently found out why. He has been supportive of me all along. I tried to forget about it and push it into the back of my mind.

Dkt. 11-1, at 9.

The District's motion for summary judgment on the Plaintiff's claims based on her "anger, anxiety and insomnia" should be denied.  Again, the relevant statute of limitations requires that the case be filed "[w]ithin three years of the time the victim discovered that the act

caused the injury for which the claim is brought . . ." RCW 4.16.340(1)(c). This statement by the

Plaintiff fails to demonstrate that she knew that more than three years before the case was filed

that the alleged abuse caused of her "anger, anxiety, and insomnia." It makes no assertion about

when the Plaintiff discovered that the abuse caused her injuries. The Plaintiff indicated in

answer to a different interrogatory, that she "she never previously connected her symptoms to the

abuse." Dkt. 11-1, at 11. Claims based on these symptoms should not be dismissed.

### E. WLAD - DISCRIMINATION AT A PLACE OF PUBLIC ACCOMODATION CLAIM

The WLAD prohibits discrimination on the basis of sex in places of public accommodation.

RCW 49.60.215. That statue provides:

> It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any . . . discrimination . . . in any place of public . . . accommodation . . . regardless of . . . sex . . .

"A school district is subject to strict liability for the discriminatory acts of its employees in

places of public accommodation." *W.H. v. Olympia Sch. Dist.*, 195 Wn.2d 779, 787 (2020).

"'Discrimination' for the purposes of a WLAD public accommodations cause of action

encompasses intentional sexual misconduct" including physical abuse and assault. *Id.,* at 792.

To make a prima facie public accommodations claim under RCW 49.60.215, a plaintiff must

show that:

> (1) the plaintiff is a member of a protected class, (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the plaintiff's protected status was a substantial factor that caused the discrimination.

*W.H.*, at 786.

The District advances two arguments in support of its motion for summary judgment on the

Plaintiff's WLAD claim. Dkt. 10. Each will be considered in turn.

First, the District contends that to the extent the Plaintiff is attempting to hold it liable under the WLAD for events that occurred in Alstad's home or car, it asserts that WLAD does not apply.  *Id.*  Alstad's home and car are not "places of public accommodation."  To the extent that the Plaintiff seeks to hold the District liable under the WLAD for events occurring in Alstad's home or car, its motion for summary judgment should be granted.

In response, the Plaintiff argues that she is entitled to recover for damages that are "proximately caused by the wrongful action."  Dkt. 13.  She also contends that holding the District liable is consistent with Washington law regarding proximate cause.  *Id.* (*citing N.L. v. Bethel Sch. Dist.,* 186 Wn.2d 422, 435 (2016)).  In *N.L.,* the Washington Supreme Court held that a negligence claim against a school district could still proceed in a case where a 14-year-old student was raped off campus (during school hours) by another student who the district knew was a registered sex offender. The Court found that the breach of the school district's duty took place while the students were on school grounds (that of a failure to protect children from known risks while on school grounds).  *Id.*  It held that "districts have a duty of reasonable care toward the students in their care to protect them from foreseeable dangers that could result from a breach of the district's duty. While the location of the injury is relevant to many elements of the tort, the mere fact the injury occurs off campus is not by itself determinative."  *Id.*  The claim at issue for the purposes of this motion, though, is not Plaintiff's negligence claim, but her claim under the WLAD.  The Plaintiff fails to cite any authority for the proposition that the District is strictly liable under the WLAD for discrimination which occurs in places that are not places of public accommodation.  The location of the injury is relevant to a WLAD claim because to make a claim, a plaintiff must be discriminated against "in any place of public accommodation."  To the

extent that the Plaintiff seeks to hold the District liable under the WLAD for events in Alstad's car and home, the motion should be granted and those claims dismissed.

The District next argues that to the extent the Plaintiff seeks to hold it liable under the WLAD for the two kisses on the cheek and the two times Alstad patted the Plaintiff on the back at school, the three-year statute of limitations applies because a kiss on the cheek and/or a pat on the back were not "childhood sex abuse" as defined in RCW 4.16.340(5), which is necessary to toll the three-year statute of limitations. *Id.*

RCW 4.16.340, the child sex abuse statute of limitation, defines "childhood sexual abuse," as "any act committed by the defendant against a complainant who was less than eighteen years of age at the time . . . and which act would have been a violation of chapter 9A.44 RCW or RCW 9.86A.040 or prior laws of similar effect at the time the act was committed." RCW 4.16.340 (5). With a few exceptions not at issue here, violations of 9A.44 RCW require either "sexual intercourse" or "sexual contact." RCW 9A.44. (For example, there is no assertion that RCW 9.86A.040, Sexual Exploitation of a Minor, which requires photography or a "live performance" of a sexual nature, or RCW 9A.44.115, voyeurism, applies here. Additionally, there is no allegation that "sexual intercourse," as defined by RCW 9A.44.010, occurred).

Accordingly, in determining whether the Plaintiff is entitled to tolling under RCW 4.16.340, the two kisses on the cheek and the two pats on the back (which occurred on campus) that she seeks to hold the District liable for under the WLAD, must be considered a violation of one of the provisions of 9A.44 RCW. Under RCW 9A.44.089(1), "[a] person is guilty of child molestation in the third degree when the person has . . . sexual contact with another who is at least fourteen years old but less than sixteen years old and the perpetrator is at least forty-eight months older than the victim." There is no dispute that the Plaintiff was under sixteen and that

Alstad was over forty-eight months older than she was at the time of the events occurring at the school.  The record does not contain her birthdate, however.

The parties dispute whether this conduct constituted "sexual contact."  RCW 9A.44.010 defines "sexual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party."

The motion for summary judgment on the Plaintiff's WLAD claims based on Alstad's kissing her on the cheek twice and patting her on the back twice should be granted.  While these actions were inappropriate, the Plaintiff has failed to point to issues of fact that the cheek or the back is a "sexual or intimate part of a person."  The District points out that there has never been a Washington case upholding a conviction for a violation of RCW 9A.44.089(1) for a kiss on the cheek or a pat on the back.  Dkt. 10 and 19 (*citing State v. Perez,* 135 Wn.App. 1012 ()(*holding* kiss on cheek twice and once on neck of eight-year-old while on lap in a locked bathroom did not amount to "sexual contact" under RCW 9A.44.010).  The Plaintiff argues kisses and pats do not account for Alstad's "early on-campus sexual harassment, grooming, and other sexual misconduct." While Alstad's acts may have been early on-campus sexual harassment, grooming, and/or sexual misconduct, the Plaintiff fails to show that any of that constitutes "sexual contact" as defined by the statute, which is required in order for the tolling provisions of RCW 4.16.340 (1) to apply.

The District's motion for summary judgment on the Plaintiff's WLAD claim, whether based on events occurring in Alstad's car or home, or on the two kisses on the cheek and pats on the back, (Dkt. 10) should be granted and the claim dismissed.

**F.  FAILURE TO REPORT CLAIM**

The Plaintiff asserts a claim against the District for failing to report Alstad's abuse to law enforcement or another appropriate agency.  Pursuant to RCW 26.44.030(1)(a), professional school personnel who have "reasonable cause to believe that a child has suffered abuse or neglect," are required to report it to the proper law enforcement or other agency.  "Abuse or neglect" is defined to include sexual abuse or exploitation.  RCW 26.44.020(1).  Washington recognizes an implied cause of action against a mandatory reporter.  *Beggs v. Dept. of Soc. and Health Servc.,* 171 Wn.2d 69, 77-78 (2011).  The District concedes that its employees are mandatory reporters under RCW 26.44.030(1)(a) and that they did not report any of Alstad's conduct with the Plaintiff to a law enforcement or other appropriate agency.  Dkts. 10 and 19.

The District moves for summary judgment on the Plaintiff's failure to report claim by arguing that the District cannot be liable for events occurring before it knew about the abuse and that, in any event, there is no evidence that the failure to report the abuse to law enforcement proximately cause harm to the Plaintiff.  Dkts. 10 and 19.

While it is not yet clear exactly when the District became aware of the alleged abuse, it is undisputed that Alstad and the Plaintiff had further inappropriate contact after it was informed.  The District argues that it is pure speculation as to what Child Protective Services ("CPS") or local law enforcement would have done if it had reported the abuse and so the Plaintiff cannot show that its failure to report proximately cause her damages from the later abuse.  This argument is contrary to what is necessary at this juncture.  The Plaintiff is entitled to reasonable inferences on a motion for summary judgment, *O'Connor v. Boeing N. Am., Inc*., 311 F.3d 1139, 1150 (9th Cir. 2002), including an inference that CPS or law enforcement would have acted.  "When the evidence yields conflicting inferences, summary judgment is improper."  *Id.*  The Plaintiff has pointed to sufficient issues of fact and is entitled to reasonable inferences which are

adequate to preclude the District's motion for summary judgment based on causation.  The District's motion for summary judgment on the Plaintiff's failure to report claim for lack of proximate cause (Dkt. 10) should be denied.

### III.   ORDER

Therefore, it is hereby **ORDERED** that:

- The Defendant's Motion for Summary Judgment (Dkt. 10) **IS**:

  - **GRANTED** as to Plaintiff's WLAD claim based on based either on events occurring in Alstad's car or home, or on the two kisses on the cheek and pats on the back; and

  - **DENIED** in all other respects.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 14th day of January, 2022.

ROBERT J. BRYAN
United States District Judge