UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARY (HENSLEY) SANCHEZ, an individual,<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>ABERDEEN SCHOOL DISTRICT NO. 5, a public corporation; CHENEY SCHOOL DISTRICT, a public corporation; Defendants Jane and John Does 1-7,<br><br>　　　　　　　　Defendants. | CASE NO. 3:21-cv-05236-RJB<br><br>ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT |

　　　　This matter comes before the Court on Defendant Aberdeen School District No. 5's ("Aberdeen") Motion for Partial Summary Judgment (Dkt. 44) and Defendant Cheney School District's ("Cheney") "response" to Defendant Aberdeen's motion for partial summary judgment (Dkt. 48) which should be construed as a motion for partial summary judgment. The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein.

　　　　This case arises from the alleged sexual misconduct of an Aberdeen High School band, Michael Alstad, with the Plaintiff, who was his student at the time. Dkts. 1 and 25. Prior to his

ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT - 1

employment at Aberdeen, Mr. Alstad worked at Cheney High School where he is alleged to have sexually abused another female student.  *Id.*  The Plaintiff, now a New Mexico resident, makes Washington state law claims against both school districts for "failure to report," negligence, "agency," and negligent infliction of emotional distress.  *Id.*  She makes an additional claim for intentional infliction of emotional distress against Aberdeen.  *Id.*

In this its second motion for summary judgment, Aberdeen moves for partial dismissal of some of the Plaintiff's claims.  Dkt. 44.  Cheney joins Aberdeen's motion and argues that Plaintiff's claims against it based on the alleged sexual assault in Alstad's car should be dismissed.  Dkt. 48.  For the reasons provided below, Aberdeen's motion (Dkt. 44) should be granted, in part, and denied, in part, and Cheney's motion (Dkt. 48) should be denied.

## I. RELEVANT AND PROCEDURAL HISTORY

### A. FACTS

Michael Alstad taught band in Cheney from 1982 to 1986; he was involved with both the high school and junior high school bands. Dkts. 39-5 at 2; 39-4 at 2.  Allegedly, after years of engaging in grooming behavior, Mr. Alstad began sexually abusing a female student, Sara Bachman-Rhodes, in the fall of 1984, her junior year of high school. Dkt. 41-7 at 42-64. This included intercourse on school grounds and on band trips.  Dkt. 41-7 at 59-60; 89.

Mr. Alstad left Cheney and was a band teacher at J.M. Weatherwax High School, commonly known as Aberdeen High School, from 1986 to 1991. Dkt. 14-1 at 2.  In 1987, Plaintiff was a 15-year-old freshman and band student. Dkt. 1.  In response to Aberdeen's interrogatories, the Plaintiff described the incidents between she and Alstad as follows:

> 1st incident: To the best of my recollection, in early 1987, I was in freshman band class with Mr. Alstad. He started to pay extra attention to me. We played for chairs which were for ranking positions within our prospective instruments. I always naturally strive for first chair. When I became first chair, he winked,

smiled, and told me that I was excellent. At first, I believed he was truly praising me for being a great player.

2nd incident: Approximately a week after the first incident, I was walking to the breezeway between the band room and the gym near the woodshop. There was a covered parking lot for teachers. I was early for class as I had band after lunch. I walked up towards the band room and Mr. Alstad was in his silver Honda CRX. He got out of his car to proceed to unlock the band room. He then approached me wearing a black trench-type coat. He proceeded to hand me his phone number and address on a small piece of paper. He then told me as he had his hand on my back that he has some of his students come to his house for private lessons or help. I was shocked and flustered at the way he approached me.

3rd incident: Often I would go to class early since it was close to Privatzy's school store and I would often eat lunch there. Approximately the following week, I went into the instrument room to grab my clarinet and my music. The room was located next to his office. I caught him standing in the doorway staring at me. I felt very uncomfortable as he was doing this. But I also felt flattered because I believed he liked me, and I enjoyed the attention at the time due to my age and not really knowing better. He came and put his hand on my back once again and asked if I had given his proposal any thought? I didn't know what to say and felt awkward. He then kissed my cheek and said, "Really think about it." I said I would as I stammered to get the words out. He made me feel as if I was the only one.

4th incident: I decided a few days later that I would call him. He answered and I asked if I could come over. He said, "Sure," and I let him know that I would be there soon. I asked my friend Cheryl Espedal to take me in her car. She agreed and told me as she dropped me off that she would be back in half-an-hour or so, and that she would honk when she arrived. As I approached his house, the porch light was on. I knocked and Mr. Alstad answered the door with a great big smile on his face. He was wearing a white, long sleeve t-shirt with dark slacks and slippers. He motioned for me to go to the couch. I asked him what he thought I needed work on to make me a better player. He didn't answer me which made the situation uncomfortable. Then I decided to make small talk about his life and asked if he was married. He told me he was divorced and he didn't have any kids. I clearly remember a Winton Marsalis framed poster leaning up against the wall. It wasn't very long that he told me, "enough talk," and he proceeded to take the barrettes out of my hair, took my face in his hands, and proceeded to kiss me forcibly. I really didn't know what to think or feel at that point. I was shocked. I felt like he really liked me and I was the only one. Approximately 30 minutes later, Cheryl honked the horn. I told him I had to go. He said, "No, you don't have to." I said, "Yes, I do." Cheryl honked again and I told him I really needed to go. I could hardly walk down the stairs as I was shaking. I got in Cheryl's car and said, "Go, just go!" This I know was on a Friday.

5th incident: When I went back to class, I went to his office before class and told him I wanted to talk about what happened. He told me to not discuss it at that time, but that I could come back to his house. He proceeded to kiss me on the cheek. I tried to ignore what happened and tried to put it at the back of my mind, but I couldn't. I felt ashamed and I felt as if it was my fault that this was happening.

6th incident: That same day, when I went to talk to him. I went back to his house. I told him that what we did was probably wrong. He acknowledged it probably wasn't the best thing to do, but he also told me, "We don't have to tell anyone." I told him I wouldn't as I was scared of what he might do if anyone found out. That night he kissed me again and I told him that I don't think this should be happening, and so I left. He said if someone at the school ever found out that he would deny everything. He seemed mad about me leaving.

7th incident: I was completely quiet at home and wouldn't talk to my parents about what happened. My dad knew something was wrong. It took me two days to finally tell my dad that I had probably did something bad. I told him everything. I begged my father not to say anything because I did not want to get him in trouble. My dad said that I was not in the wrong and that he was going to contact the school and tell them to do something about it. He said, "If they don't do something about it then I'm going to clean his clock." The next day my father went to the school. He told Lynn Baker, Charles Randolph, and Frank Morrisey. I was coming from class in the Phillips building and saw my father's Toyota station wagon out front. I waited for him to come outside and asked him, "You told them, didn't you?" He said, "Your darn right I did, and I only did it for you." I ran off and skipped my next class and went to Sam Benn park. That night I told him I wanted to go live with my brother because I felt like I needed to defend Mr. Alstad and I was mad at my father for bringing this all out in the open. My brother came and got me at my house and then I went to live with him for a week so that I could get a different perspective on things.

8th incident: About three days later, I was called down to the principal's office. Mr. Randolph, Mr. Morrisey and Mr. Baker sat me down in front of them. Mr. Randolph proceeded to tell me they had went through my locker and found my Pee Chee with "I love Mike" on it along with a letter I had written. I tried to deny it by saying it was someone else. He said that if I "didn't cool it" that I "could get him fired." I agreed I would.

9th incident: I went back to band class and that was when Mr. Alstad treated me like garbage. Often ignoring me and glaring at me as if I was the enemy. I figured I could be the adult in the situation and I wanted to continue with band as I loved it and had taken it ever since I was in late elementary school. That was not the case. Instead the school blamed me. Approximately a week later, I was called down to the counseling center and Mr. Bogdonovich's office. Mr. Bogdonovich told me I could no longer be in band. I was devastated and asked, "Why?" He told

ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT - 4

me, "You know why." I didn't know what to say. I didn't ask questions anymore and my band days were over for the time being.

10th incident: In 1988, I wanted to take band again as I really desired to be in marching band as my brother had been. I talked my friend Mollie Catterson to join with me. She reluctantly agreed and went with me a handful of times. She told me that she was quitting because she was really uncomfortable around him. I was upset but continued on. He wasn't really happy that I was back in band and you could tell by his actions. Sometimes though he would smile at me like he had before. I went to marching practices and everything. Then it came time to get our uniforms. I went to the office to get my uniform and he proceeded to tell me they ran out of uniforms. I told him that's just an excuse because he couldn't be an adult and just forget about what happened between us. I then proceeded to call him an a**hole and walked out and never went back to band. That was almost to end of the 1988 class year.

11th incident: I proceeded to go back for very little of my junior year sharing a locker with freshman Tina Logan. I could tell that some of the kids knew what had happened. This made me feel uncomfortable. By then I had made up my mind that I would switch schools to Montesano High School. I asked for a transfer which the administrator signed. I was able to enjoy band for a short time at Monte but the credit system was very different from Aberdeen so I dropped out and got my GED.

12th Incident: Approximately early 1989, I called Mr. Alstad because I wanted closure that I never felt I received. I was attending Monte at the time and went to my friend Mollie Catterson's house. I had called two times prior to this time and Mr. Alstad would wait outside but I didn't go out the prior two times. The third time I called he showed up and I did go. Mollie told me not to but I did I told her I needed closure. I got into his red Mazda Miata convertible. I told him, nice car reminds me of a Jag, and he smiled and said, "yeah it does doesn't it." We talked on the way down and I told him I was able to be in band now. He said, "That's good." I also tried to persuade him to admit that what he did was wrong. He didn't. We pulled over at a gravel turnout near Ocean Shores. He then took his belt off and proceeded to try to overpower me kissing me and moving my hand to his crotch area. I pushed him away and made him get off of me. And I told him to take me back. He obliged and we didn't talk the whole way back to my friend Mollie's. That was the final time I ever saw him.

Dkt. 11-1, at 3-8. As to the last incident, the Plaintiff testified that she was 17 years old at the time (her birthday is in January of 1972). Dkt. 45 at 20 and 28. She also testified that Alstad arrived in a "little red Mazda Miata, that he had just boughten [sic]." *Id.* at 28-32. The Plaintiff testified that the event occurred in December of 1989 while she was a

ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT - 5

junior at Montesano High School.  *Id.* at 36.  In support of its motion, Aberdeen points to a Warranty Vehicle report that shows that Mr. Alstad purchased a red Mazda Miata on April 4, 1991.  Dkt. 46 at 3-5.  That vehicle was assembled on January 23, 1991.  *Id.*  The record also contains a declaration purporting to be from Mr. Alstad (signed in Canada) in which he asserts that he bought a Miata in April of 1991 and that prior to that time his car was a silver Honda.  Dkt. 47 at 1.

The Plaintiff asserts that she was harmed by Mr. Alstad's sexual grooming and abuse of her.  Dkt. 11-1 at 9.  She seeks damages, costs and attorneys' fees.  Dkt. 25.

**B. PENDING MOTION**

Aberdeen moves for summary judgment dismissal of the Plaintiff's claims (1) based on vicarious liability/"agency," (2) negligent hiring, (3) damages predicated on events occurring before it had knowledge of Alstad's abuse, and (4) based on the last alleged sexual assault that took place in Alstad's Mazda Miata.  Dkt. 44.  In its response, Cheney joins Aberdeen's motion, in part, and argues that Plaintiff's claims against it based on the alleged sexual assault that took place in Alstad's Mazda Miata should be dismissed.  Dkt. 48.

The Plaintiff responded opposing the motions (Dkt. 49), Cheney and Aberdeen filed replies (Dkts. 51 and 52).  The motions are ripe for decision.  While Aberdeen and the Plaintiff both exceeded page limits allowed under Local Rule W.D. Wash. 7(e)(3) for their briefs, in the interest of fully and fairly addressing the issues, all of the briefs were considered.

**II.     DISCUSSION**

**A. STATE SUBSTANTIVE AND FEDERAL PROCEDURAL LAW APPLIES**

The Court has jurisdiction over the case due to the diversity of the parties' citizenship under 28 U.S.C. § 1332.  Dkts. 1 and 25.  Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S.

64 (1938), federal courts sitting in diversity jurisdiction, as here, apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities*, *Inc.*, 518 U.S. 415, 427 (1996). In applying Washington law, the Court must apply the law as it believes the Washington Supreme Court would apply it. *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial, which is a preponderance of the evidence in most civil cases. *Anderson,* 477 U.S. at 254; *T.W. Elect.,* 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the

1  nonmoving party only when the facts specifically attested by that party contradict facts
2  specifically attested by the moving party.  The nonmoving party may not merely state that it will
3  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial
4  to support the claim.  *T.W. Elect.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at
5  255).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts"
6  will not be "presumed."  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888–89 (1990).

**C. ABERDEEN'S MOTION FOR SUMMARY JUDGMENT ON VICARIOUS LIABILITY/"AGENCY" CLAIM**

In Washington,

> Vicarious liability, otherwise known as the doctrine of respondeat superior, imposes liability on an employer for the torts of an employee who is acting on the employer's behalf. Where the employee steps aside from the employer's purposes in order to pursue a personal objective of the employee, the employer is not vicariously liable. . . . However, the scope of employment is not a limit on an employer's liability for a breach of its own duty of care.

*Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 48 (1997).  "Washington courts uniformly have held as a matter of law that an employee's intentional sexual misconduct is not within the scope of employment."  *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wn. App. 25, 38 (2016).

Aberdeen's motion for summary judgment on the Plaintiff's claim for vicarious liability/agency (Dkt. 44) should be granted.  The Plaintiff maintains that there are issues of fact as to whether Mr. Alstad's victimization of her was outside the scope of his employment because he sexually groomed her in band class, used his position to gain access to her, invited her to his home for music lessons, and Aberdeen failed to show that it prohibited this conduct through training and policies.  "A sexual relationship between a teacher and a student does not benefit the employer and is not within a teacher's scope of employment." *Bratton v. Calkins*, 73 Wn. App. 492, 500–01 (1994).  Plaintiff's arguments relate to Aberdeen's violation of its duties of care but

do not show that there are issues of fact as to whether Aberdeen is vicariously liable for Alstad's alleged abuse. The Plaintiff's claim for vicarious liability/agency should be dismissed.

### D. ABERDEEN'S MOTION FOR SUMMARY JUDGMENT ON NEGLIGENT HIRING CLAIM

"To prove negligent hiring, the plaintiff must demonstrate that (1) the employer knew or, in the exercise of ordinary care, should have known of the employee's unfitness at the time of hiring; and (2) the negligently hired employee proximately caused the plaintiff's injury." *Rucshner v. ADT, Sec. Sys., Inc*., 149 Wn. App. 665, 680 (2009).

To the extent that she makes one, the Plaintiff's claim for negligent hiring should be dismissed. There is no evidence that Aberdeen knew, or should have known, of Alstad's unfitness at the time of hiring. Aberdeen's motion for summary judgment on the Plaintiff's claim for negligent hiring (Dkt. 44) should be granted.

### E. ABERDEEN'S MOTION FOR SUMMARY JUDGMENT ON DAMAGES BASED ON EVENTS BEFORE IT HAD NOTICE OF ALLEGED ABUSE

1. <u>Negligence and Gross Negligence</u>

To prevail on a negligence claim, a Washington plaintiff must show (a) the existence of a duty to the plaintiff, (b) a breach of that duty, (c) a resulting injury, and (d) the breach as the proximate cause of the injury." *Turner v. Washington State Dep't of Soc. & Health Servs*., 198 Wash.2d 273, (2021)(*internal quotation marks and citations omitted*). "Gross negligence is negligence substantially and appreciably greater than ordinary negligence, i.e., care substantially or appreciably less than the quantum of care inhering in ordinary negligence." *Johnson v. Spokane to Sandpoint, LLC*, 176 Wn. App. 453, 460 (2013).

Aberdeen moves for summary judgment by arguing that it is not liable for the events occurring before it had knowledge of the alleged abuse, in essence, because it had no duty to the

Plaintiff to prevent a risk of harm to her that it did not know existed.  That is, that it cannot be held liable for the injuries the Plaintiff sustained from Alstad's alleged abuse which occurred before her father confronted the school administrators – before they knew of the risk of harm Alstad posed to her.

"As a general rule, there is no duty to prevent a third party from intentionally harming another unless a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct." *Niece* at 43.  Under Washington law, a duty arises where:

> (a) a special relation exists between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or
>
> (b) a special relation exists between the defendant and the other which gives the other a right to protection.

*Id.*  As is relevant here, there is a special relationship between school districts and their students.  *Harris v. Fed. Way Pub. Sch.*, 21 Wn. App. 2d 144, 153 (2022).  School districts have an enhanced duty of reasonable care to protect their students, which includes protecting the students in their custody from foreseeable dangers.  *Niece* at 43; *Id.*  "As long as the harm was within the general field of danger which should have been anticipated, it is foreseeable." *Harris* at 153.  Where a special relationship exists, "[i]ntentional or criminal conduct may be foreseeable unless it is so highly extraordinary or improbable as to be wholly beyond the range of expectability." *Niece* at 50.

There are issues of fact as to whether sexual abuse of a student by a teacher under the facts in this case falls within "the general field of danger" that should have been anticipated by Aberdeen.  Cases involving negligent training and supervision outside special relationships that give rise to enhanced duties are unhelpful in determining the foreseeability of Aberdeen's duty

ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT - 10

here. *Niece* at 49. Aberdeen points to *Peck v. Siau*, 65 Wn. App. 285, 293 (1992) which held that the sexual abuse of a student by a school librarian was not foreseeable because the school did not know of the librarian's dangerous propensities. That Court of Appeals case was decided before the Washington Supreme Court decided *Niece*. While *Niece* did not expressly overrule *Peck,* it was critical of the *Peck* court's approach; the *Peck* court failed to consider the duties from the special relationship that arises between the school and the student and instead focused on the relationship between the school and the employee. *Niece* at 50. Aberdeen also points to *Kok v. Tacoma Sch. Dist. No. 10,* 179 Wn. App. 10 (2013). In *Kok,* a student with paranoid schizophrenia shot another student in the hallway at Foss High School. *Id.* The victim's parents sued the school for negligence. *Id.* The case was dismissed because the student shooter's behavior and medical records did not indicate that he was a risk to harm other students. *Id.* The Washington Court of Appeals found that the risk there was not foreseeable and so it was not within the "general field of danger covered by the specific duty" the school owed the victim. *Id.*

This case is distinguishable from *Peck* and *Kok.* Here, it was not only Mr. Alstad's potential dangerousness that is at issue. Aberdeen itself failed to train and supervise the teachers and staff regarding sexual abuse of students. It had no policy in place that forbid teachers from taking students to their homes. Another Aberdeen student filed suit against Mr. Alstad for alleged sexual misconduct while he was a teacher at Aberdeen. *M.J. v. Aberdeen School Dist. No. 5, et. al.,* Snohomish County, Washington Superior Court case number 19-2-01675-31. In response to Plaintiff M.J.'s interrogatories, Mr. Alstad indicted that Aberdeen failed to train him on "boundary invasions, sexual harassment, sexual misconduct, exploitation of minors, communicating with students, socializing with students or how to identify sexual grooming behavior." Dkt. 50-1 at 3. In response to Plaintiff M.J.'s interrogatories and requests for

ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT - 11

production, Aberdeen was not able to produce any documents or any training curriculums on those topics during the relevant time. Dkt. 50-2 at 3-5. It also failed to provide any evidence of any training on state mandatory reporting requirements that were in effect at the time. *Id.* at 3. There are issues of fact as to whether it was foreseeable and likely that a student would be sexually abused given Aberdeen's failures. Aberdeen's motion for summary judgment on the Plaintiff's claim for negligence and gross negligence should be denied.

      2. <u>Negligent Infliction of Emotional Distress</u>

"A plaintiff may recover for negligent infliction of emotional distress if she proves duty, breach, proximate cause, damage, and objective symptomatology." *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 505 (2014).

As it did regarding the Plaintiff's negligence claim, Aberdeen moves for dismissal of her negligent infliction of emotional distress claim, arguing that it has no duty to the Plaintiff because Alstad's conduct was not foreseeable. The motion should be denied. Given Aberdeen's failure to act, there are issues of fact as to whether sexual abuse of the Plaintiff by a teacher was in the "general field of danger" covered by the duty it owed her.

      3. <u>Outrage</u>

In Washington, "[t]he tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003). Any claim for outrage "must be predicated on behavior so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 196 (*internal quotations and citation omitted*). "The question of whether certain conduct is sufficiently outrageous is

ordinarily for the jury, but the court must initially determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Costanich v. State, Dep't of Soc. & Health Servs.*, 177 Wn. App. 1025 (2013).

There are issues of fact as to whether Aberdeen's conduct here was sufficiently outrageous in character to be "utterly intolerable in a civilized community." Despite having been told of a staff member allegedly sexually abusing a student, it did not take action to protect her. Its motion for summary judgment on this claim should be denied.

4. <u>Failure to Report</u>

Pursuant to RCW 26.44.030(1)(a), professional school personnel who have "reasonable cause to believe that a child has suffered abuse or neglect," are required to report it to the proper law enforcement or other agency. "Abuse or neglect" is defined to include sexual abuse or exploitation. RCW 26.44.020(1). Washington recognizes an implied cause of action against a mandatory reporter. *Beggs v. Dept. of Soc. and Health Servc.*, 171 Wn.2d 69, 77-78 (2011). Aberdeen concedes that its employees are mandatory reporters under RCW 26.44.030(1)(a) and that they did not report any of Alstad's conduct with the Plaintiff to a law enforcement or other appropriate agency.

Aberdeen moves to dismiss the Plaintiff's claim for failure to report the sexual abuse for events that occurred before it was informed of the abuse. To the extent that the Plaintiff makes a claim for failure to report for events occurring before Aberdeen was aware of the abuse, the motion should be granted. On January 14, 2022, Aberdeen's motion for summary judgment on this issue was denied. At that time, discovery was ongoing and it was not clear, based on the evidence in the record, what Aberdeen knew and when it knew it. Discovery has now closed. While the Plaintiff asserts that Aberdeen's motion is essentially an improper motion for

reconsideration, the case was at a different stage at that time. There is nothing in the rules that prohibits more than one motion for summary judgment on an issue. In any event, the Plaintiff has failed to point to evidence that Aberdeen knew or had "reasonable cause to believe" of the alleged abuse before her father confronted school officials.

To the extent the Plaintiff makes a claim for failure to report the abuse for the timeframe after her father confronted school officials, the claim should not be dismissed. As stated in the following section F., there are issues of fact as to when the last alleged sexual assault occurred.

### F. BOTH DISTRICTS' MOTIONS FOR SUMMARY JUDGMENT BASED ON THE LAST ALLEGED SEXUAL ASSAULT

Both Defendant school districts move for summary judgment on all claims predicated on the last alleged sexual assault - the one Plaintiff thought occurred in Alstad's Mazda Miata. Dkts. 44 and 48. They contend that RCW 4.16.340, which tolls the three year statute of limitation for injuries suffered as a result of childhood sex abuse, does not apply because the Plaintiff was over 18 years of age when the event occurred.

The Plaintiff testified that the event occurred in December of 1989 while she was a 17 year old junior at Montesano High School. Dkt. 45 at 28 and 36. (Her birthday is in January of 1972). She also testified that Alstad drove a "little red Mazda Miata, that he had just boughten [sic]." Dkt. 45 at 28-32. The Plaintiff noted that the car was red with a black interior. *Id.*

Mr. Alstad's declaration states that he purchased the Miata in April of 1991 and prior to that time his car was a silver Honda. Dkt. 47 at 1. Aberdeen also points to a Warranty Vehicle report that shows that Mr. Alstad purchased a red Mazda Miata on April 4, 1991. Dkt. 46 at 3-5. That vehicle was assembled on January 23, 1991. *Id.* In April of 1991, Defendants assert that the Plaintiff was over 18 years of age, and was, in fact 19.

ORDER ON PARTIAL MOTIONS FOR SUMMARY JUDGMENT - 14

There are issues of fact as to when the alleged sexual assault took place. While Defendants have shown that Alstad owned a red Mazda Miata in April of 1991, it should be left to a fact finder to determine whether they believe that this is the only time he has owned such a car and whether the Plaintiff correctly remembers the year and/or the car. The Defendants' motions for summary judgment as to claims based on this event should be denied.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- Aberdeen School District No. 5's Motion for Partial Summary Judgment (Dkt. 44) **IS:**
    - **GRANTED** as to her claim for vicarious liability/agency, negligent hiring, and failure to report based on events occurring before her father confronted school officials; and
    - **DENIED** as to all other claims; and
- Defendant Cheney School District's motion for partial summary judgment (Dkt. 48) **IS DENIED.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 29th day of March, 2023.

ROBERT J. BRYAN
United States District Judge